LYN-ANN COOMBES, administratrix,[1] *vs.* ROLAND J. FLORIO.

Norfolk. May 8, 2007. - December 10, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Negligence,* Doctor, Duty to warn, Foreseeability of harm, Causation. *Doctor,*
   Doctor-patient relationship.

This court reversed a judgment of the Superior Court, in a civil action brought
   by the mother of a ten year old boy who was struck and killed by an
   automobile driven by a patient of the defendant doctor, granting summary
   judgment in favor of the doctor on the ground that he owed no duty of
   care to anyone other than his own patient. [183-195]
IRELAND, J., concurring, with whom SPINA and COWIN, JJ., joined, would conclude
   that a physician owes a duty of reasonable care to everyone foreseeably
   put at risk by the physician's failure to warn of the side effects of the
   physician's treatment of a patient, and that considering the number and
   nature of the drugs prescribed in this case, the age and health of the
   patient, and an earlier assurance about the ability of the patient to drive, it
   was foreseeable that the patient would suffer side effects that would impair
   his driving, and that an accident would result; further, the plaintiff presented
   sufficient evidence to create a genuine issue of material fact as to the cause
   of the accident. [183-195]
GREANEY, J., concurred in the determination that summary judgment in favor
   of the doctor should not have been granted, where the plaintiff, in her
   complaint, sought damages for the doctor's alleged negligent failure to
   warn the patient that his various medications would affect him in a manner
   so as to make it dangerous for him to operate a motor vehicle and to
   advise him not to operate a motor vehicle while taking these medications,
   but dissented from the pronouncement that a physician owes a duty of care
   to everyone foreseeably put at risk by the physician's failure to warn a
   patient of the effects of the physician's treatment of that patient. [195-201]
MARSHALL, C.J., dissented on the grounds that conflating the duty to warn with
   the much more comprehensive duty of care would vastly enlarge the field
   of physician liability, and existing tort law did not impose on a doctor a
   duty to warn a patient of the adverse side effects of medication, and that
   obligating a physician to warn a patient against driving when the physician
   had knowledge of a danger that might be posed to others from the patient's
   decision to operate a motor vehicle while under the influence of prescribed
   medication would effectively dictate that the physician forbid the patient
   from engaging in any hazardous activities while taking the prescribed

---

[1] Of the estate of Kevin Coombes.

medication, regardless of whether, in the physician's professional opinion, such a warning was necessary or wise in the individual patient's circumstances. [201-206]

CORDY, J., dissented on the ground that imposing a duty vastly expanding the potential liability of a physician to persons with whom the physician has had no contact or relationship was not compelled by precedents, and did not reflect existing social values, customs, and appropriate social policy, but rather would alter a physician's affirmative duty to care for a patient and would create an unlimited number of third parties who might threaten the strongly held policy of confidentiality with respect to communications between doctor and patient. [206-213]


CIVIL ACTION commenced in the Superior Court Department on July 17, 2002.

The case was heard by *Elizabeth B. Donovan,* J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*William P. Rose* (*Peter L. Eleey* with him) for the plaintiff.

*Edward F. Mahoney* for the defendant.

*Carl Valvo & John R. Hitt,* for Professional Liability Foundation, amicus curiae, submitted a brief.

*Marsha V. Kazarosian, J. Michael Conley, & Joseph C. Borsellino,* for Massachusetts Academy of Trial Attorneys, amicus curiae, submitted a brief.

BY THE COURT. The judgment of the Superior Court granting the defendant's motion for summary judgment is reversed. The case is remanded to the Superior Court for further proceedings.


*So ordered.*


Separate opinions of Justice Ireland, with whom Justice Spina and Justice Cowin join; Justice Greaney; Chief Justice Marshall; and Justice Cordy.


IRELAND, J. (concurring, with whom Spina and Cowin, JJ., join). In this case we consider whether a physician owes a duty of care to someone other than his patient for harm caused by his failure to warn the patient of the effects of his treatment of that patient. The decedent, Kevin Coombes, died of injuries he

sustained when he was struck by an automobile driven by David Sacca. At the time of the accident Sacca was under the care of his physician, the defendant, Roland Florio. The plaintiff claims that the accident was caused when the side effects of the medication Dr. Florio prescribed caused Sacca to lose control of the automobile. The plaintiff sued Dr. Florio for negligence.[1] A judge in the Superior Court granted Dr. Florio's motion for summary judgment, on the ground that Dr. Florio owed no duty of care to anyone other than his own patient. The plaintiff appealed and we transferred the case on our own motion. Because I believe that Dr. Florio owes a duty of care to all those foreseeably put at risk by his failure to warn about the effects of the treatment he provides to his patients, I agree that this court should reverse the judgment of the Superior Court.

1. *Background.* I recite the facts in the light most favorable to the plaintiff, reserving details for later discussion. Dr. Florio became Sacca's primary care physician in 1999. By 2002, when the accident occurred, Sacca was seventy-five years old and had been diagnosed with a number of serious medical conditions including asbestosis, chronic bronchitis, emphysema, high blood pressure, and metastatic lung cancer that had spread to his lymph nodes. As the primary care physician, Dr. Florio coordinated the multiple specialists who were involved in Sacca's care, and was responsible for all of the prescription medication that Sacca used. By the time of the accident Sacca was visiting Dr. Florio six or seven times each year. Shortly after the cancer was diagnosed, in July, 2000, Dr. Florio warned Sacca that it would not be safe for him to drive during his treatment for cancer. Sacca obeyed the warning and did not drive until the fall of 2001, when treatment for his cancer concluded. At that time Dr. Florio advised Sacca that he could safely resume driving.

At the time of the accident Sacca had prescriptions from Dr. Florio for Oxycodone, Zaroxolyn, Prednisone, Flomax, Potassium, Paxil, Oxazepam, and Furosemide. Potential side effects of the drugs include drowsiness, dizziness, lightheadedness, fainting, altered consciousness, and sedation.[2] According to

---

[1]The plaintiff also sued Sacca for negligence and wrongful death. Sacca died in August, 2002, and a stipulation of dismissal with prejudice entered in February, 2005.

[2]At least one of the drugs is sometimes accompanied by a warning from the

the plaintiff's expert, when used in combination these drugs have the potential to cause "additive side effects" that could be more severe than side effects resulting from separate use. The plaintiff's expert also opined that the sedating effects of these drugs can be more severe in older patients, and that the standard of care for a primary care physician includes warning elderly or chronically ill patients about the potential side effects of these drugs, and their effect on a patient's ability to drive. Dr. Florio did not warn Sacca of any potential side effects. Before the accident occurred Sacca reported no side effects from the medication and had no trouble driving. Sacca's last visit to Dr. Florio before the accident was on January 4, 2002. At that visit, Dr. Florio did not discuss potential side effects and gave no warning about driving.

On the day of the accident, March 22, 2002, Sacca drove his automobile to do some errands. On his way home he lost consciousness and his automobile left the road and hit Coombes, who was standing on the sidewalk with a friend. Sacca regained consciousness shortly after the accident and was taken to a nearby hospital. He left the hospital against medical advice and the cause of the incident was never determined. The plaintiff's expert opined that the accident was probably caused by a combination of Sacca's medical conditions and the medication he was taking.

The plaintiff sued Dr. Florio for negligently prescribing medication without warning Sacca of the dangers posed by its side effects, and without warning Sacca not to drive. The case proceeded to the Superior Court, where a judge granted summary judgment for the doctor, ruling that there was no special relationship between Dr. Florio and Coombes, and that Dr. Florio owed Coombes no duty.[3]

2. *Discussion.* "The standard of review of a grant of sum-

---

pharmacy not to operate heavy machinery or vehicles. There is no evidence whether the bottles containing Sacca's medication had such a warning. The presence of such a warning label would not diminish Dr. Florio's duty to warn of side effects. As a general rule it is the duty of a physician, and not a pharmacist, to warn of side effects of medication. See *Cottam* v. *CVS Pharmacy*, 436 Mass. 316, 321-323 (2002).

[3]The judge's decision did not address the plaintiff's alternative theories of ordinary negligence and assumed duty, discussed *infra.*

mary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), citing Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). An order granting summary judgment will be upheld only if it relies on undisputed material facts and the moving party is entitled to judgment as a matter of law. *Community Nat'l Bank* v. *Dawes*, 369 Mass. 550, 556 (1976).

I begin by clarifying the nature of the plaintiff's claim. It is not a malpractice claim because it lacks a physician-patient relationship between plaintiff and defendant, an essential element of any malpractice claim. See *St. Germain* v. *Pfeifer*, 418 Mass. 511, 520 (1994). Instead, the plaintiff presents an ordinary negligence claim. As framed by the plaintiff's complaint, it is limited to Dr. Florio's failure to warn of the known potential side effects of the medications he prescribed.[4]

The plaintiff presents three different arguments supporting her claim that Dr. Florio committed a breach of a duty owed not only to Sacca, but also to Coombes. First, she argues that under ordinary common-law negligence principles Dr. Florio was negligent in prescribing medication without warning Sacca of their potential side effects, and that Dr. Florio's duty in this regard extended to Coombes because his injury was a foreseeable consequence of that negligence. Second, she argues that once Dr. Florio assured Sacca that it would be safe to drive he assumed a duty to warn Sacca of the dangers of driving while using the medications he later prescribed, and that this duty was owed to all those put at risk by affirming Sacca's ability to drive. Third, relying on this court's interpretation of the Restatement

---

[4]The complaint does not allege negligence resulting from a failure to warn Sacca of the dangers of driving due to the underlying health problems for which Dr. Florio was treating him. Dr. Florio's motion for summary judgment and the plaintiff's opposition to that motion are similarly limited. Although the plaintiff raised this argument in a hearing before the judge and in her brief to this court, the complaint was not amended to include that claim, and Dr. Florio did not expressly or impliedly consent to its inclusion. See Mass. R. Civ. P. 15 (b), 365 Mass. 761 (1974). Cf. *Graham* v. *Quincy Food Serv. Employees Ass'n & Hosp., Library & Pub. Employees Union*, 407 Mass. 601, 615-616 (1990). Therefore, the plaintiff's argument regarding a duty to warn of the risk of driving with health problems is not before the court.

(Second) of Torts § 315 (1965), she argues that the special relationship between doctor and patient creates a duty of reasonable care that extends not only to a patient but to others put at risk by the medical care provided. The plaintiff's special relationship and assumed duty theories are inapplicable in this case.[5] However, I agree that Dr. Florio owed a duty to Coombes under ordinary negligence principles.

"To recover for negligence, a plaintiff must show 'the existence of an act or omission in violation of a . . . duty owed to the plaintiff[s] by the defendant." *Cottam* v. *CVS Pharmacy,* 436 Mass. 316, 320 (2002), quoting *Dinsky* v. *Framingham,* 386 Mass. 801, 804 (1982). Whether a defendant owes a plaintiff a duty of reasonable care is a question of law that is decided "by reference to existing social values and customs and appropriate social policy." *Cremins* v. *Clancy,* 415 Mass. 289, 292 (1993). "We have recognized that '[a]s a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others.' See *Remy* v. *MacDonald,* [440 Mass. 675,] 677 [(2004)] . . . . A precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor. . . . Consequently, with some important exceptions, 'a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.' *Tarasoff* v. *Regents of the Univ. of Cal.,* [17 Cal. 3d 425,] 434-435 [(1976)]." (Citations omitted.) *Jupin* v. *Kask,* 447 Mass. 141, 147 (2006). Although a jury are uniquely qualified to determine the scope of the duty at issue, see *Commonwealth* v. *Angelo To-*

---

[5]A duty voluntarily assumed must be performed with due care. *Mullins* v. *Pine Manor College,* 389 Mass. 47, 52 (1983), and cases cited. Had Dr. Florio assumed a duty to warn Sacca not to drive, his performance of that duty would be measured against the standard of a person with the skill and competence of a physician. See Restatement (Second) of Torts § 323 comment b (1965). Thus, whether Dr. Florio's duty to warn arises as an assumed duty or as a duty based on traditional negligence principles, the scope of the resulting duty to warn would be identical. See *Woods* v. *O'Neil,* 54 Mass. App. Ct. 768, 771-772 n.5 (2002); *Croall* v. *Massachusetts Bay Transp. Auth.,* 26 Mass. App. Ct. 957, 960 (1988). Because I conclude that he owed a duty to Coombes under ordinary negligence principles, I do not address the plaintiff's theory of assumed duty. The plaintiff's alternative theory of special relationship is discussed *infra.*

*desca Corp.*, 446 Mass. 128, 137-138 (2006), "[t]he existence of a legal duty is a question of law appropriate for resolution by summary judgment." *Afarian* v. *Massachusetts Elec. Co.*, 449 Mass. 257, 261 (2007). "If no such duty exists, a claim of negligence cannot be brought." *Remy* v. *MacDonald, supra.*

In the context of medical professionals, this court has held that a doctor's duty of reasonable care, owed to a patient, includes the duty to provide appropriate warnings about side effects when prescribing drugs. *Cottam* v. *CVS Pharmacy, supra* at 321. As a result, "[p]hysicians . . . are required to inform their patients of those side effects they determine are necessary and relevant for patients to know in making an informed decision." *Id.* When the side effects in question include drowsiness, dizziness, fainting, or other effects that could diminish a patient's mental capacity, this warning serves to protect the patient from, for example, the foreseeable risk of an automobile accident caused by driving while under the influence of the medication. In the case of automobile accidents, it is clear that the foreseeable risk of injury is not limited to the patient.

In similar cases outside the medical context, when the foreseeable risk in question is the risk of an impaired driver causing an automobile accident, we have extended a duty of reasonable care to all those involved in such a foreseeable accident, including other motorists, bicyclists, and pedestrians. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 7-8, 10-12 (1983) (liquor store liable for injuries to cyclist struck by automobile driven by minor to whom liquor store had sold beer); *Jesionek* v. *Massachusetts Port Auth.*, 376 Mass. 101, 106 (1978) (jury could have found owner of forklift liable to pedestrian injured when drunken seaman drove forklift over her foot; foreseeable consequence of negligently leaving key in ignition); *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498, 501 (1968) (negligence of bar extended to motorist killed in collision with automobile driven by man who became intoxicated at bar). This is so even when the plaintiff is unknown to the defendant before the accident. See *Jupin* v. *Kask, supra* at 149 n.8 (foreseeability of danger to specific person irrelevant; sufficient that general kind of harm was foreseeable); *Adamian* v. *Three Sons, Inc., supra* at 500-501 (foreseeable consequence of selling liquor to

intoxicated patron was that accident would injure third party, even when identity of third party was unforeseeable).

Our cases have also held that a duty can exist even when the unreasonably dangerous condition involves the foreseeable criminal or negligent conduct of an intermediary. See *Jupin* v. *Kask, supra* at 149; *Onofrio* v. *Department of Mental Health*, 408 Mass. 605, 610 (1990), *S.C.*, 411 Mass. 657 (1992); *Michnik-Zilberman* v. *Gordon's Liquor, Inc., supra* at 11-12; *Mullins* v. *Pine Manor College*, 389 Mass. 47, 51-52 (1983). See also Restatement (Second) of Torts §§ 302A & 302B (1965). In *Jupin* v. *Kask, supra* at 143, a homeowner failed to store properly a gun kept in her home. A police officer was later shot and killed by the gun owner's son, who had taken the weapon from the improperly locked cabinet. *Id.* at 145. We concluded that it was foreseeable that the gun owner's adult son, who had a history of violence, had problems with the law, and was under psychiatric observation, would use the unsecured weapon in the commission of a violent crime. *Id.* at 149. The homeowner's duty to properly store the gun was owed not only to members of the household, but also to victims harmed as a result of the unauthorized use of the gun. *Id.* at 149 n.8, 160. Whether the owner actually did or should have foreseen the particular plaintiff and the particular circumstances of the harm that eventually occurred was irrelevant. *Id.* at 149 n.8. The homeowner owed a duty to the police officer who was shot because the harm the officer suffered was a foreseeable consequence of the homeowner's risk-creating conduct. *Id.* That the harm was also the result of the criminal actions of the son did not foreclose the homeowner's responsibility because the possibility of his criminal conduct was foreseeable, and his criminal actions were enabled by the owner's own negligent storage of the gun. *Id.* at 148-150.

We reached a similar conclusion in *Michnik-Zilberman* v. *Gordon's Liquor, Inc., supra* at 12, in which a liquor store negligently sold beer to a minor. Hours later, after drinking some of the beer, the minor drove his car while intoxicated and caused an accident, killing a bicyclist. *Id.* at 8. In considering whether the harm to the bicyclist was the foreseeable result of the sale of the beer, we concluded that in the case of alcoholic beverages served to minors, "[o]ne of the more foreseeable

risks is that the minor may drive and cause harm to third persons while intoxicated." *Id.* at 12. The criminal or negligent conduct of the intervening actor, here the minor who purchased the alcohol and then drove while intoxicated, did not foreclose the store's duty to the bicyclist. *Id.* The actions of the minor purchaser and the injury suffered by the bicyclist were a foreseeable consequence of the store's negligent sale. *Id.*

Relying on those same principles, I conclude that a physician owes a duty of reasonable care to everyone foreseeably put at risk by his failure to warn of the side effects of his treatment of a patient. See *McKenzie* v. *Hawai'i Permanente Med. Group, Inc.*, 98 Haw. 296, 307-309 (2002); *Joy* v. *Eastern Me. Med. Ctr.*, 529 A.2d 1364, 1366 (Me. 1987); *Hardee* v. *Bio-Med. Applications of S.C., Inc.*, 370 S.C. 511, 516 (2006); *Burroughs* v. *Magee*, 118 S.W.3d 323, 331 (Tenn. 2003); Restatement (Third) of Torts: Liability for Physical Harm § 41 comment h at 807 (Proposed Final Draft No. 1, 2005). But see *Gilhuly* v. *Dockery*, 273 Ga. App. 418 (2005); *Kirk* v. *Michael Reese Hosp. & Med. Ctr.*, 117 Ill. 2d 507, 531-532 (1987), cert. denied, 485 U.S. 905 (1988); *Calwell* v. *Hassan*, 260 Kan. 769, 783-784 (1996).

Courts in other jurisdictions have imposed a duty on doctors in circumstances similar to this case. In *McKenzie* v. *Hawai'i Permanente Med. Group, Inc.*, *supra* at 307-309, the court held that a doctor owed a duty to a person killed in an automobile accident caused by the doctor's patient who was driving after taking medication prescribed for him by the doctor. The court reasoned that "a logical reason exists to impose upon physicians, for the benefit of third parties, a duty to advise their patients that a medication may affect the patient's driving ability when such a duty would otherwise be owed to the patient." *Id.* at 308. In *Joy* v. *Eastern Me. Med. Ctr.*, *supra* at 1366, the court held that a doctor owed a duty to a person killed in an automobile accident that was caused by his patient, who was driving while wearing an eye patch that had been given to him as part of the treatment for an eye abrasion. The court concluded that "the general requirement [is] that when a doctor knows, or reasonably should know that his patient's ability to drive has been affected, he has a duty to the driving public as well as to the patient to warn his patient of that fact." *Id.*

I recognize that some courts have limited a doctor's duty to

third parties to warn of the effects of drugs or treatments that were administered by the doctor, while declining to extend liability where the drugs were prescribed by the doctor but used outside of his presence. See, e.g., *Cheeks* v. *Dorsey,* 846 So. 2d 1169, 1173 (Fla. Dist. Ct. App. 2003); *Lester* v. *Hall,* 126 N.M. 404, 406-407 (1998). I decline to make such a distinction. When a doctor prescribes medication it is both a foreseeable and intended result that a patient will take the medication. The occurrence of known side effects, and the impact of such side effects on the patient's ability to drive, are foreseeable results of that prescription. Furthermore, the inability of a doctor to control the conditions under which his patient takes prescribed drugs is not determinative where, as here, the plaintiff contends only that the doctor owed a duty to warn. See *Cottam* v. *CVS Pharmacy, supra* at 321.

Sound public policy also favors a duty in these circumstances. The costs of imposing a duty owed to individuals other than a patient are limited because existing tort law already imposes on a doctor a duty to warn a patient of the adverse side effects of medications. See *Cottam* v. *CVS Pharmacy, supra,* citing *McKee* v. *American Home Prods. Corp.,* 113 Wash. 2d 701, 709 (1989). The duty described here does not impose a heavy burden because it requires nothing from a doctor that is not already required by his duty to his patient. See *McKenzie* v. *Hawai'i Permanente Med. Group, Inc., supra* at 306; *Hardee* v. *Bio-Med. Applications of S.C., Inc., supra*; *Burroughs* v. *Magee, supra* at 333. Meanwhile, the benefits of such warnings are significant. They serve to protect the public from the very harm that creates the parallel duty to the patient, the foreseeable risk that known side effects of a drug will impair a patient's ability to drive. See *McKenzie* v. *Hawai'i Permanente Med. Group, Inc., supra* at 307; *Burroughs* v. *Magee, supra* at 332-333.

Dr. Florio argues that the increased number of potential plaintiffs created by this rule could create a fear of litigation that would intrude into a doctor's very decision of what medication to prescribe or what treatment to pursue. Any such harmful consequence would be limited because the duty I describe is limited to warning of the effects of treatment. This duty is narrower than a doctor's duty to use due care when deciding to

prescribe a particular drug or pursue a particular course of treatment. I need not address whether a nonpatient could base a negligence claim on a doctor's negligent prescribing decision, although I recognize that protecting the doctor-patient relationship may provide a sound policy reason for limiting such a duty to the patient. See *McKenzie* v. *Hawai'i Permanente Med. Group, Inc.*, *supra* at 303; *Burroughs* v. *Magee*, *supra* at 333.

Dr. Florio also argues that widespread concern with medical malpractice rates justifies imposing a "no duty" rule in this case, and for support he cites a number of statutes enacted by the Legislature that attempt to limit the liability of doctors. Allowing a larger number of potential plaintiffs may result in some increase in litigation, and that may in turn result in an increase in medical malpractice rates. However, I would leave to the Legislature the task of determining whether to impose further limits on doctors' liability.

Turning now to the facts of this case, and considering those facts in the light most favorable to the plaintiff, it is left to determine whether it was foreseeable that Dr. Florio's failure to warn of the side effects of Sacca's medications could cause an automobile accident. I conclude that it was, and that Dr. Florio owed a duty to all those foreseeably put at risk by his failure to warn, including Coombes. The medications Dr. Florio prescribed had known potential side effects including dizziness, drowsiness, and altered consciousness, symptoms that were likely to impair a motorist. See *McKenzie* v. *Hawai'i Permanente Med. Group, Inc.*, *supra* at 307 ("it is evident that a patient who is unaware of the risk of driving while under the influence of a particular prescription medication will probably do so"); *Kaiser* v. *Suburban Transp. Sys.*, 65 Wash. 2d 461, 465 (1965) (bus accident allegedly caused when driver suffered side effect of drowsiness was "in the general field of danger, which should reasonably have been foreseen by the doctor when he administered the drug"). The combination of drugs had the potential to result in "additive side effects" that further increased the likelihood that Sacca's ability to drive would become impaired. Sacca's age also increased the likelihood and potential severity of any side effects. Dr. Florio had also previously advised Sacca that he could safely resume driving, thereby making it all the

more foreseeable that an accident would occur. Any duty that Dr. Florio owed to warn of the side effects of medication he prescribed extended not only to Sacca, but to those whose injuries were foreseeably caused by the resulting accident. This does not imply Dr. Florio owed a duty to Coombes to warn of every side effect of every drug he prescribed. Rather, considering these facts in the light most favorable to the plaintiff, including the number and nature of the drugs prescribed, the age and health of the patient, and the earlier assurance about the ability of the patient to drive, it was foreseeable that Sacca would suffer side effects that would impair his driving, and that an accident would result. Therefore, Dr. Florio's duty to warn extended to Coombes. Ultimately, of course, whether Dr. Florio committed a breach of that duty when prescribing these drugs to Sacca without a warning is a factual determination left to a jury.[6]

As support for his contention that the accident was not foreseeable, Dr. Florio points to the length of time that passed between when the drugs were first prescribed and when the accident occurred with no report of side effects, and the absence of any evidence that Sacca experienced difficulty driving before the accident occurred. However, the breach of duty alleged by the plaintiff occurred when Dr. Florio first prescribed the drugs without warning of their potential effects. The subsequent passage of time without incident could not retrospectively lessen a doctor's duty, a breach of which had already taken place, to warn of potential side effects.

Dr. Florio cites our past reliance on the Restatement (Second) of Torts § 315 (1965) to argue that he has no duty to control

---

[6]The plaintiff claims that Dr. Florio was negligent both for failing to warn of side effects and for omitting a separate warning not to drive. Although the issue is not reached here, several courts have held that a physician owes no duty to third parties to warn of obvious dangers. See *Weigold* v. *Patel*, 81 Conn. App. 347, 357-358 (2004) (no duty to warn of dangers of driving when patient knew medication caused drowsiness and impaired her ability to operate automobile); *Young* v. *Wadsworth*, 916 S.W.2d 877, 878 (Mo. Ct. App. 1996) (no duty to warn patient with history of blackouts not to drive where danger of doing so was open and obvious). Under this approach a jury could conclude that Dr. Florio gave a warning of potential side effects that obviously implied that it would be dangerous to drive while under the influence of the drugs. The same jury could conclude that Dr. Florio had satisfied his duty of reasonable care even if he provided no specific warning not to drive.

the actions of an intermediary such as Sacca in the absence of a special relationship between himself and Coombes. He argues that because he had no ability to control Sacca's actions, and because a doctor-patient relationship is not a special relationship for purposes of § 315, he could have owed no duty to Coombes. He misunderstands the role of special relationships in establishing a duty. Section 315 is an exception to the general rule, stated in § 314, that a person has no duty to act affirmatively to protect another from harm. It describes one circumstance where an affirmative duty to control the actions of an intermediary may be imposed: "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct . . . ." We have invoked this rule when determining whether an affirmative duty existed. See, e.g., *Kavanagh* v. *Trustees of Boston Univ.*, 440 Mass. 195, 202-203 (2003) (neither basketball coach nor university owed duty to player of opposing team because there was no special relationship between them); *Jean W.* v. *Commonwealth*, 414 Mass. 496, 513-514 (1993) (Liacos, C.J., concurring) (special relationship between parole officer and parolee could impose duty on officer to control conduct of parolee). However, there is no need to resort to imposing an affirmative duty to conclude that Dr. Florio owed a duty to Coombes. It was Dr. Florio's own act of prescribing medication that created the foreseeable risk of an accident, and his duty to warn flows from that act and extends to all those foreseeably put at risk by it.[7] See *McKenzie* v. *Hawai'i Permanente Med. Group, Inc.*, supra at 299-300 (special relationship arguments inapplicable where de-

---

[7]The Restatement (Third) of Torts: Liability for Physical Harm § 37 comment a, at 710 (Proposed Final Draft No. 1, 2005), supports this distinction in the application of Restatement (Second) of Torts § 315 (1965). Indeed the comment appears to disavow Dr. Florio's interpretation of § 315:

"Section 315 of the Second Restatement stated a more specific rule subsumed within § 314 that an actor owed no duty to control third parties, subject to stated exceptions. Section 315, however, neglected to clarify that its no-duty rule was conditioned on the actor having played no role in facilitating the third party's conduct, such as providing a dangerous weapon to an insane individual." *Id.*

fendant's own act created foreseeable risk). Even allowing an affirmative duty in this case, § 315 would have limited relevance because it provides only that a person has no duty to *control* the conduct of another in the absence of a special relationship, whereas the duty claimed by the plaintiff is merely a duty to *warn.* Dr. Florio's contention that he had no ability to control Sacca's actions would therefore present no barrier to imposing even an affirmative duty to warn.

Finally, Dr. Florio argues that there is insufficient evidence in the record to support the plaintiff's contention that the accident was caused by the side effects of Sacca's medication. "A court must deny a motion for summary judgment if, viewing the evidence in the light most favorable to the nonmoving party, there exist genuine issues of material fact . . . ." *Golub* v. *Milpo, Inc.,* 402 Mass. 397, 400 (1988), citing Mass. R. Civ. P. 56 (c). The plaintiff has presented evidence that the known side effects of Sacca's medication included drowsiness, lightheadedness, and altered consciousness. Her expert states that the medication was probably one factor contributing to the accident. Although Dr. Florio points to the absence of any conclusive evidence that the side effects of the medication were the cause of the accident, the plaintiff has presented sufficient evidence to create a genuine issue of material fact as to the cause of the accident. Summary judgment is therefore inappropriate.

3. *Conclusion.* For the reasons set forth above, I concur in the decision to reverse the grant of summary judgment for Dr. Florio.

GREANEY, J. (concurring in part and dissenting in part). The undisputed facts of this case are tragic. David E. Sacca, a seventy-five year old, gravely ill man, suffered from, among other ailments, asbestosis, chronic obstructive pulmonary disease, high blood pressure, and metastatic lung cancer. He had never before caused a motor vehicle accident (nor been issued a traffic citation) until March 22, 2002, when he lost control of his motor vehicle and struck and killed Kevin Coombes, a ten year old boy. Sacca's physical and emotional health quickly declined, and he died four months after the accident. The plaintiff asserts that Sacca had taken several prescription medicines that rendered

him unable to drive safely and ultimately caused him to lose consciousness while driving on March 22, and further, that Sacca's physician, Dr. Roland J. Florio, failed to warn Sacca of the hazards of driving while taking the prescribed medications. Had Dr. Florio properly cautioned Sacca, the plaintiff argues, the accident would not have occurred. In my view, when a physician who has knowledge of a danger that may be posed to others from a patient's decision to operate a motor vehicle while under the influence of prescribed medication (a danger of which the public has no way of knowing) does not warn the patient of the risks involved, the physician may be held liable for injuries to others caused by the failure to warn. The imposition of limited liability in such a case, where the circumstances warrant, may prevent tragedies similar to this one in the future.

I cannot agree, however, with the proposition that liability in such a case is justified by principles of ordinary negligence. This concept is incorrect and leads Justice Ireland (and those Justices joining his opinion) to the sweeping conclusion that physicians owe a legal duty of care to virtually everyone who may come in contact with one of his or her patients. This conclusion is unwarranted and goes far beyond what is necessary to resolve this case. The plaintiff, in her complaint, seeks damages for Dr. Florio's alleged negligent failure to warn Sacca "that his various medications would affect him in a manner so as to make it dangerous for him to operate a motor vehicle and to advise him not to operate a motor vehicle while taking these medications." For this court to grant more than the requested relief, by creating a precautionary duty previously unknown in common law, would be extraordinary. Accordingly, although I concur in the court's determination that summary judgment for Dr. Florio should not have been granted, I dissent from the pronouncement, in Justice Ireland's opinion, that a physician owes a duty of care to everyone foreseeably put at risk by his failure to warn a patient of the effects of his treatment of that patient. My reasons are as follows.

Physicians' decisions concerning patient care are matters of professional judgment and, with the exception of malpractice claims (which this is not), fall beyond the scope of judicial fact finding. To equate a physician's prescribing of medication to "unreasonably dangerous" conduct, *ante* at 189 (Ireland, J.,

concurring), similar to serving alcohol to minors or already inebriated persons or to the reckless storage of firearms, which creates a general affirmative duty of care to others, is an immoderate and indefensible characterization of the medical profession, and one that, as Chief Justice Marshall (*post* at 203-204 [Marshall, C.J., dissenting]) and Justice Cordy (*post* at 206 & n.1 [Cordy, J., dissenting]) point out, impermissibly intrudes on the traditional physician-patient relationship held virtually inviolate since the time of Hippocrates. A physician should not, in ordinary circumstances, be held legally responsible for the safety of others on the highway, or elsewhere, based on medical treatment afforded a patient. To a physician, it is the patient (and not a third party with whom the physician has no direct contact) who must always come first. I also am skeptical of the court's assumption that "existing social values, customs, and considerations of policy" dictate the imposition of an unlimited affirmative duty of care in this case. *Luoni* v. *Berube*, 431 Mass. 729, 730 (2000).

It must be recognized, however, that, beyond the traditional, there exists a separate legal relationship between a physician and his or her patient. Based on that relationship, a physician is required to warn the patient of known potentially dangerous side effects of prescribed medication, including the possibility of experiencing drowsiness or loss of consciousness while under the medication's influence. See *Cottam* v. *CVS Pharmacy*, 436 Mass. 316, 321-322 (2002).[1] In the usual case, so long as a physician provides his patient with an appropriate warning

[1]The interpretation given to *Cottam* v. *CVS Pharmacy*, 436 Mass. 316, 321-322 (2002), by Chief Justice Marshall, *post* at 202-203 & n.1 (Marshall, C.J., dissenting), is more limited than that expressed in the *Cottam* decision itself. The *Cottam* court reasoned: "The rationale for [applying the learned intermediary doctrine to prescription drug manufacturers] is that physicians have the duty to inform themselves about the drug and warn their patients as they deem necessary. Physicians, after considering the history and needs of their patients and the qualities of the drug, are required to inform their patients of those side effects they determine are necessary and relevant for patients to know in making an informed decision. . . . Requiring the manufacturer to provide warnings directly to the consumer would interfere with the doctor-patient relationship." *Id.* at 321, citing *McKee* v. *American Home Prods. Corp.*, 113 Wash. 2d 701, 709 & 711 (1989). We held that, "[b]ecause the physician is the appropriate person to perform the duty of warning a patient of the possible side effects of prescription drugs, we now extend [the learned intermediary]

(cautioning the patient about the possible danger of driving), the applicable standard of care has been met, and a physician has no further duty. This is so because many medications may affect a patient's ability to drive safely, and the physician's legal duty is to give appropriate warnings to a patient, in a manner consistent with the warnings advised by the medication's manufacturer[2] and the physician's personal knowledge of the patient's over-all health condition, including the effects of additional medications being taken by the patient.

Extending the scope of liability for the benefit of third parties foreseeably put at risk by an uninformed patient's decision to drive alters neither the physician's medical decision to prescribe medication nor the physician's legal duty under the *Cottam* decision to warn the patient about adverse side effects. Because the foreseeable risk of danger that the patient faces (here, death or bodily injury due to a motor vehicle accident) is the identical risk that the physician may anticipate others, such as the plaintiff's son, to encounter, there can arise no conflict of professional interest. Contrast *Spinner* v. *Nutt*, 417 Mass. 549, 553-554 (1994) (lawyer's primary duty owed to client bars imposition of secondary duty owed to third parties). The imposition of liability for a failure to warn a patient rests on a physician's superior knowledge of the risks (to the patient and to others) involved, and the physician's professional responsibility to ensure that a patient understands the risks involved in taking prescribed medications.

A physician's advice may not be followed, of course, and a physician has no ability physically to prevent a patient from driving (or engaging in any behavior that may be risky to himself or others). It cannot be said, therefore, that a physician has a duty to control a patient's behavior once that patient departs from the physician's office. Contrast *Irwin* v. *Ware*, 392 Mass.

---

doctrine to pharmacies." *Id.* at 322. My understanding of the import of the *Cottam* decision, set forth above, is correct.

[2]For example, if the physician is prescribing a sleep aid, the physician should provide the patient with a warning, consistent with the manufacturer's warning, that with respect to driving a motor vehicle, the patient should avoid taking the sleep aid with alcohol and should not drive, or operate heavy machinery, until the patient knows how he or she will react to the sleep aid, and that the patient should avoid engaging in all hazardous activities (such as operating a motor vehicle or heavy machinery) immediately after taking the sleep aid.

745, 756 (1984), citing W. Prosser, Torts § 56 (4th ed. 1971); Restatement (Second) of Torts § 315(a) (1965) (duty to control conduct of third person to prevent physical harm to another when "special relation exists between the actor and the third person"). There is, however, a recognized measure of authority within the physician-patient relationship, which permits, and even requires, a physician to take steps to influence (or attempt to influence) a patient's conduct on matters within the scope of that relationship. By informing (or otherwise counselling or advising) a patient of known potential side effects of prescribed medications that might affect the patient's ability to drive a motor vehicle safely, and where appropriate, warning the patient not to drive at all, a physician may effectively avoid any risk of danger to the patient and to others. See *McKenzie* v. *Hawai'i Permanente Med. Group, Inc.*, 98 Haw. 296, 308 & n.13 (2002)[3]; Restatement (Third) of Torts: Liability for Physical Harm § 41(a) (Proposed Final Draft No. 1, 2005) ("actor in a special relationship with another owes a duty of reasonable care to third persons with regard to risks posed by the other that arise within the scope of the relationship"); *id.* at § 41 comment h ("physician's duty to the patient is explicitly relational

---

[3]I take issue with the Chief Justice Marshall's pronouncement, *post* at 205 (Marshall, C.J., dissenting), that the Supreme Court of Hawai'i, in *McKenzie* v. *Hawai'i Permanente Med. Group, Inc.*, 98 Haw. 296, 300 (2002), "expressly disavow[ed] the 'special relationship' analysis as 'inapplicable' in a case with strikingly similar facts" to this one. The Hawaii court did reject a physician-patient relationship analysis, but did so in the context of evaluating a claim involving a physician's misfeasance, i.e., the negligent prescription of medication, and *not* in the context of a claim involving a physician's nonfeasance, i.e., the physician's failure to warn. See *id.* at 300 & n.4. The Hawaii court's conclusion, that "a logical reason exists to impose upon physicians, for the benefit of third parties, a duty to advise their patients that a medication may affect the patient's driving ability when such a duty would otherwise be owed to the patient," almost exactly mirrors my own. *Id.* at 308. Further, the Hawaii court expressly based that conclusion, as do I, on considerations that (1) a physician has superior knowledge of the risks of which a patient might otherwise be unaware; (2) warning against driving might prevent substantial harm; and (3) imposing a duty on physicians would create little additional burden because the same duty (to warn) already is owed a patient. I remain unconvinced, however, of the correctness of the Hawaii court's fourth expressed rationale, that "the majority of jurisdictions appear to recognize [such] a duty under some circumstances." *Id.* at 307. Other jurisdictions appear to me to be evenly divided on the issue.

[and i]n some cases, care provided to a patient may create risks to others").[4]

In sum, a physician's duty to warn a patient arises entirely within the context of the physician-patient relationship. Further, this duty is owed strictly to the patient, in the sense that a phy-

---

[4]The citation to § 41 comment h of the Restatement (Third) of Torts: Liability for Physical Harm § 41 (Proposed Final Draft No. 1, 2005), post at 205 (Marshall, C.J., dissenting), is uncharacteristically imprecise. A more complete, and therefore more accurate, quotation of comment h (that focuses primarily on circumstances in which a physician treats a patient with a communicable disease) is as follows:

"The physician-patient relationship is not among the relationships listed in this Section as creating an affirmative duty. That does not mean that physicians have no affirmative duty to third persons. Some of the obligations of physicians to third parties, such as with patients who are HIV infected, have been addressed by [L]egislatures. In other areas, the case law is sufficiently mixed, the factual circumstances sufficiently varied, and the policies sufficiently balanced that this Restatement leaves to further development the question of when physicians have a duty to use reasonable care or some more limited duty — such as to warn only the patient — to protect third persons. In support of a duty is the fact that an affirmative duty for physicians would be analogous to the affirmative duty imposed on mental-health professionals. . . . In fact, the burden on a physician may be less than that on a psychiatrist, because the costs of breaching confidentiality may be lower. Diagnostic techniques may be more reliable for physical disease and the risks that it poses than for mental disease and its risks.

"Many courts have imposed an affirmative duty on physicians when the patient would have preferred a warning or other precaution to benefit a family member or other person with whom a patient has a relationship. . . . On the other hand, some courts are concerned that any precaution a physician might take would have little or no effect in reducing the risk, especially for warnings to patients about risks of which they were already aware. These courts might lack confidence in their ability accurately to address factual causation in these cases. They may also be concerned with the administrative costs entailed in identifying the few cases in which causation exists. This Restatement takes no position on how these competing concerns should be resolved.

"If a court does impose an affirmative duty to nonpatients, it must address both the content of the duty and the question of who can recover. For example, a court might limit the scope of a physician's duty to warning the patient of risks that the patient poses to others. A court might then hold that the physician's liability extends to any person harmed by the patient's condition or a more limited class based on relationship with the patient, time, or place."

sician has no duty to warn others of the dangerous propensities of a patient who drives while on medication known to cause drowsiness or blackouts (either unaware of the danger or despite being aware of the danger). The violation of that duty, however, in the limited circumstances described, may give rise to liability in negligence to others who are foreseeably injured as a direct result of the violation.[5]

Here, under the summary judgment standard, the plaintiff's facts, if accepted, would permit a jury to find that because Dr. Florio should have been aware of the side effects of the medications being taken by Sacca, and was aware of Sacca's dire medical condition, he should have warned Sacca not to drive a motor vehicle at all. The plaintiff must still, of course, demonstrate to a jury that Dr. Florio violated his duty to warn Sacca not to drive while taking the medications and, further, that the violation was the cause of the fatal accident. If the elements of negligence are successfully proved, however, the plaintiff should be allowed to recover damages from Dr. Florio.

Decisions such as this one are necessarily based on the factual situation before the court. Negligence law is not suitable to sweeping pronouncements, and as experience indicates, a revised or expanded tort principle is better left to case-by-case development. I would not preclude other actions to apply the principle, but would leave the contours of the duty to warn to be drawn in future fact-based inquiries.

MARSHALL, C.J. (dissenting). The events giving rise to the claims in this case are indeed tragic. See *ante* at 195 (Greaney, J., concurring in part and dissenting in part). But I respectfully disagree with the opinion of Justice Ireland (and the two Justices who join him) that would establish for the first time in this Commonwealth a physician's duty to prevent harm to nonpatients, and would do so in sweeping terms. See *ante* at 184 (Ireland, J., concurring) (physician "owes a duty of care to all those foreseeably put at risk by his failure to warn about the

---

[5]I also would reject the plaintiff's theory that Dr. Florio voluntarily assumed a duty to warn, for reasons set forth by Justice Cordy, *post* at 207 n.2 (Cordy, J., dissenting).

effects of the treatment he provides to his patients"). I also cannot agree with Justice Greaney's more cabined opinion that "a physician who has knowledge of a danger that may be posed to others from a patient's decision to operate a motor vehicle while under the influence of prescribed medication . . . may be held liable for injuries to others caused by the failure to warn" the patient of the risks involved. *Ante* at 196 (Greaney, J., concurring in part and dissenting in part). In my view, the Superior Court judge properly granted summary judgment to Dr. Florio on the ground that he owed no duty to the decedent.

Justice Ireland would hold that "a physician owes a duty of reasonable care to everyone foreseeably put at risk by his failure to warn of the side effects of his treatment of a patient." *Ante* at 190 (Ireland, J., concurring). The opinion is grounded on two false premises. First, as Justice Cordy describes, Justice Ireland conflates the "duty to warn" with the much more comprehensive "duty of care," and thus vastly enlarges the field of physician liability. See *post* at 210 (Cordy J., dissenting). See also Restatement (Third) of Torts: Liability for Physical Harm § 41 comment h (Proposed Final Draft No. 1, 2005) (duty to warn is "more limited" than duty to use reasonable care). Second, Justice Ireland asserts that the physician liability to third parties he would impose falls readily within the penumbra of our decision in *Cottam* v. *CVS Pharmacy*, 436 Mass 316 (2002) (*Cottam*), where, according to Justice Ireland, "existing tort law already imposes on a doctor a duty to warn a patient of the adverse side effects of medications." *Ante* at 191 (Ireland, J., concurring). Our existing tort law does not impose such a duty, and *Cottam* does not bear the weight Justice Ireland assigns it.

At issue in *Cottam*, among other things, was the interplay between, on the one hand, a patient's need for information sufficient to give informed consent to prescribed medications and, on the other, a physician's need for autonomy within the physician-patient relationship to act based on the physician's reasoned professional judgment and his "knowledge of the patient's medical history and unique condition." *Id.* at 321. On this point we were careful to note that the physicians' duty is "to inform themselves about the drug and warn their patients *as they deem necessary*." *Id.* Lest there be any doubt of the scope of the duty,

we further stated that physicians, after considering the history and needs of their patients and the quality of the drugs, are required "to inform their patients of those side effects *they determine are necessary and relevant* for patients to know in making an informed decision" (emphasis added). *Id.* Our statement of a doctor's duty to his patient was precisely calibrated to protect patients from harm while avoiding judicial interference with the doctor-patient relationship.

By seeking to impose on doctors a duty to third parties that would require a physician to inform a patient of any and all side effects of any and all treatments of a patient, Justice Ireland does not limit his opinion to warnings of the potential side effects of prescription medications.[1] See *ante* at 184, 190 (Ireland, J., concurring). Rather, his opinion stretches the narrow holding in *Cottam* beyond recognition. In doing so, he significantly shrinks the essential and protected space within which doctor and patient can freely move together. Gone would be the physician's ability to exercise independent professional judgment about how to present treatment options to the patient. Gone would be the option to omit discussion of remotely possible adverse side effects. The physician's concern for a patient's ability to assess information about needed and appropriate treatment would be forced to compete with concern for an amorphous, but widespread, group of third parties whom a jury might one day determine to be "foreseeable" plaintiffs. The physician would be forever looking over his shoulder. Nothing in *Cottam*, a case of informed consent, portends

---

[1] *Cottam* v. *CVS Pharmacy*, 436 Mass. 316 (2002) (*Cottam*), does not impose a duty on a physician to warn his patient of every side effect of every drug he prescribes, let alone every treatment he recommends. Justice Ireland declares that he does "not imply that Dr. Florio owed a duty to Coombes [the decedent] to warn of every side effect of every drug he prescribed," *ante* at 193 (Ireland, J., concurring), but only that Dr. Florio had some (unspecified) duty to give some (unspecified) warnings to his patient in light of "the number and nature of drugs prescribed, the age and health of the patient, and the earlier assurance about the ability of the patient to drive," *id.* This purported qualification creates confusion at the very point where clarity is required. Which side effects of which drugs could Dr. Florio have ignored? What difference does his patient's age make? Lacking clarity about the scope of the required duty to warn, physicians would proceed at their peril if they exercised their professional judgment to warn a patient only of side effects of prescription medications they "deem necessary." *Cottam, supra* at 321.

the effort to impose such blanket expansion of doctors' liability to third parties.[2]

Justice Greaney's more restrained analysis of the scope of a doctor's liability to nonpatients[3] also is not supported by the conclusion or rationale of *Cottam*. To hold, as Justice Greaney would, that a physician is obligated by a duty to third parties to warn a patient against driving when "a physician . . . has knowledge of a danger that may be posed to others from a patient's decision to operate a motor vehicle while under the influence of prescribed medication," *ante* at 196 (Greaney, J., concurring in part and dissenting in part), is effectively to dictate that a physician forbid a patient from engaging in any "hazardous activities" including operating a motor vehicle or heavy machinery, *ante* at 198 n.2 (Greaney, J., concurring in part and dissenting in part) while taking the prescribed medication, regardless of whether, in the physician's professional opinion, such a warning is necessary or wise in the individual patient's circumstances.[4] Cf. *Cottam*, *supra* at 321 (discussing physician's duty

[2]As described more fully by Justice Cordy, *post* at 213 n.6 (Cordy, J., dissenting), the breadth of Justice Ireland's conclusion that any treatment — even those not involving prescription medications — imposes a "duty of care" to third parties is unsupported by the cases from other jurisdictions on which he relies. See, e.g., *McKenzie* v. *Hawai'i Permanente Med. Group, Inc.*, 98 Haw. 296, 308 (2002) ("we believe that a logical reason exists to impose upon physicians, for the benefit of third parties, a duty to advise their patients that a medication may affect the patient's driving ability when such a duty would otherwise be owed to the patient"); *Joy* v. *Eastern Me. Med. Ctr.*, 529 A.2d 1364, 1366 (Me. 1987) ("when a doctor knows, or reasonably should know that his patient's ability to drive has been affected [by prescribed medications], he has a duty to the driving public as well as to the patient to warn his patient of that fact"); *Hardee* v. *Bio-Medical Applications of S.C., Inc.*, 370 S.C. 511, 516 (2006) (recognizing physician's duty to "the motoring public" to warn patient of risks of operating motor vehicle arising from physician's treatment); *Burroughs* v. *Magee*, 118 S.W.3d 323, 333 (Tenn. 2003) (physician owed duty of care to patient and to members of motoring public to warn patient "of the possible adverse effect of the two prescribed drugs on his ability to safely operate a motor vehicle").

[3]The duty proposed by Justice Greaney would be imposed only on physicians who prescribed medications that the physician has reason to know may affect the patient's ability to drive a motor vehicle safely. *Ante* at 196 (Greaney, J., concurring in part and dissenting in part).

[4]The attempt to limit the duty Justice Greaney would impose on physicians, i.e., that a physician should give a warning "consistent with the manufacturer's warning" and that a physician should warn a patient that he "should not

"to inform their patients of those side effects they determine are necessary and relevant for patients to know in making an informed decision").

For the reasons detailed by Justice Cordy in his dissent, I also reject Justice Greaney's premise that the physician's purported duty to a nonpatient radiates from the "special relationship" of physician to patient. See *post* at 207 n.3 (Cordy, J., dissenting). See also *ante* at 197-198 (Greaney, J., concurring in part and dissenting in part). Indeed, *McKenzie* v. *Hawai'i Permanente Med. Group, Inc.*, 98 Haw. 296 (2002), relied on by Justice Greaney, see *ante* at 199 (Greaney, J., concurring in part and dissenting in part), expressly disavows the "special relationship" analysis as "inapplicable" in a case with strikingly similar facts. *Id.* at 300. See Restatement (Third) of Torts: Liability for Physical Harm § 41 comment h (Proposed Final Draft No. 1, 2005) ("The physician-patient relationship is not among the relationships listed in this Section as creating an affirmative duty").

Finally, I fail to see how the unwarranted extension of judicial power suggested by the concurring opinions is cured by Justice Ireland's invitation to the Legislature to fix the result reached today. *Ante* at 192 (Ireland, J., concurring) ("I would leave to the Legislature the task of determining whether to impose further limits on doctors' liability"). The invitation reverses the appropriate roles of the legislative and judicial branches. It is for the court to proceed incrementally with the expansion of common-law tort principles, and for the Legislature to initiate, if it chooses, the policy process of comprehensive tort reform. One need not be clairvoyant to understand the inevitable result of today's enlargement of liability: a significant increase in third-party litigation against doctors and an attendant increase in

drive, or operate heavy machinery, until the patient knows how he or she will react" to a particular prescribed medication, *ante* at 198 n.2 (Greaney, J., concurring in part and dissenting in part), does not in fact place any boundaries around the duty he would recognize. The appropriateness of a physician's warning will always be called into question when a third party is injured. In this case there is evidence that the patient had driven without difficulty while taking the prescribed medications. Under Justice Greaney's formulation the jury will now be permitted, indeed required, to delve into the nature of the warning given and to determine for themselves whether it was adequate, imposing liability on a physician who may have given a warning but one the jury deem not adequate.

expenses at a time when our health care system is already overwhelmed with collateral costs. The contrasting opinions issued today suggest just how widely and thoroughly reasonable minds may differ on this matter of broad social import.

Today's result impedes not only the work of doctors. It impedes the work of our courts. On remand, the trial judge is left the unenviable task of divining from the vague generalizations of the concurring opinions the outer limits of a novel duty of physicians to third-party nonpatients. Because I agree with the trial judge that the physician's liability does not extend to the third-party decedent in this case, I would uphold the grant of summary judgment in Dr. Florio's favor, and not leave it to trial judges to puzzle their way through this thorny issue of public policy.

· CORDY, J. (dissenting). The opinion of Justice Ireland (and the two Justices who join him) would recognize a new duty vastly expanding the potential liability of a physician to persons with whom the physician has had no contact or relationship. This duty is not compelled by our precedents, nor does it reflect "existing social values and customs and appropriate social policy," *Cremins* v. *Clancy*, 415 Mass. 289, 292 (1993). To the contrary, the duty would interfere with, and distort, the highly personal, confidential physician-patient relationship, recognized since the time of Hippocrates, circa 400 B.C.[1] It would alter a physician's affirmative duty to care for his patient by introducing a new audience to which the physician must attend — everyone who might come in contact with the patient. It would create an unlimited number of third parties who might now demand to know precisely what a doctor and patient have discussed regarding medication and treatment, threatening our strongly held policy of confidentiality with respect to such communication. While Justice Ireland attempts to cast the duty he would impose as limited in scope and mild in effect, it would establish a principle with broad and troubling implications.

[1]The Oath of Hippocrates, taken by many physicians, provides in part: "[W]hatsoever I shall see or hear in the course of my profession, as well as outside my profession in my intercourse with men, if it be what should not be published abroad, I will never divulge, holding such things to be holy secrets." 1 Hippocrates 301 (W.H.S. Jones, trans., Harvard Univ. Press 1984).

Because I find this to be unwarranted and ill advised, I respectfully dissent.

The plaintiff offers three arguments supporting her claim that the doctor owed the decedent a legal duty: (1) the doctor voluntarily assumed a duty; (2) the doctor has a "special relationship" with his patient thereby creating a duty to third parties; and (3) the doctor created a reasonably foreseeable risk to the decedent (ordinary negligence). I agree with Justice Ireland's rejection of the first two of these arguments.[2,3] I disagree with his acceptance of the third.

Justice Ireland's reasoning begins with the axiom that a physi-

---

[2] The first, that the doctor voluntarily assumed a duty to the decedent, clearly fails. Insofar as the doctor voluntarily assumed a duty to anyone, it was to his patient, not to the plaintiff's decedent. The plaintiff offers no legal support for the proposition that a doctor's assumption of a duty to a patient constitutes an assumption of a duty to a third party. Moreover, it is not correct to speak of a doctor assuming or not assuming a "duty to warn" his patient about the effects of medications. *Ante* at 187 n.5 (Ireland, J., concurring). Informing a patient about the risks and effects of medication is not a separate duty a doctor voluntarily assumes; rather, it is part and parcel of the doctor's duty of care for the patient, grounded in the doctor-patient relationship. See *Cottam* v. *CVS Pharmacy*, 436 Mass. 316, 322 (2002) (*Cottam*).

[3] The plaintiff's special relationship argument is similarly without merit. A person ordinarily has no duty to protect a third party against the dangerousness or unlawful acts of others, *Luoni* v. *Berube*, 431 Mass. 729, 731 (2000), except where there is a "special relationship" between the actor (here the driver) and the person (the doctor) that imposes a duty on the latter to control the former. Restatement (Second) of Torts § 315(a) (1965). In the category of special relationships, we have recognized at common law the duty of a parent to control a minor child, the duty of a master to control the conduct of his servant, and the duty of a possessor of land or chattels to control the conduct of his licensee. See Restatement (Second) of Torts, *supra* at §§ 316-318; *Luoni* v. *Berube*, *supra*. There is no duty of a physician to control his patient.

This court has also recognized a "special relationship" in situations where the duty to control is premised, at least in part, on a responsibility created by statute. Most prevalent in this category are cases involving the sale and consumption of alcoholic beverages, an area highly regulated by statute. See, e.g., *Irwin* v. *Ware*, 392 Mass. 745 (1984) (town liable to injured motorist where police had released intoxicated driver back onto roadway); *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498 (1968) (bar owner could be held liable to those injured by patron to whom bar negligently served excessive quantities of alcoholic beverages). Cf. *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 10-11 (1983), quoting *Rappaport* v. *Nichols*, 31 N.J. 188, 201-202 (1959) (finding prohibition on sale of liquor to minors, G. L. c. 138, §§ 34, 69, intended "for the protection of members of the general public as well"). See also *Jean W.* v. *Commonwealth*, 414 Mass. 496, 498-499 (1993) (Liacos,

cian has a duty to warn a patient of potential side effects when prescribing medications. *Ante* at 188 (Ireland, J., concurring), citing *Cottam* v. *CVS Pharmacy*, 436 Mass. 316, 321 (2002) (*Cottam*).[4] He then notes that, when those side effects (such as drowsiness or dizziness) could "diminish a patient's mental capacity, this warning serves to protect the patient from . . . the foreseeable risk of an automobile accident." *Ante* at 188 (Ireland, J., concurring). He further points out that in the case of automobile accident, the class of legally foreseeable victims includes "other motorists, bicyclists, and pedestrians." *Id.* From this, he would concludes that a physician "owes a duty of care to all those foreseeably put at risk by his failure to warn about the effects of the treatment he provides to his patients." *Ante* at 184 (Ireland, J., concurring).

In my view, this reasoning does not adequately address the principal issue in this case, which is not the duty of a doctor to a patient, or the duty of a patient-driver to an accident victim, but the duty of a doctor to the victim of a patient's negligent conduct. There is no debate that it is foreseeable that the victims of an impaired driver are not only the driver but other drivers, pedestrians, or cyclists. The impaired driver plainly has a duty to all potential (foreseeable) victims. But extending the duty of the driver's physician, grounded in the doctor-patient relation-

C.J., concurring) (duty on part of parole officers to ensure parolees not erroneously released).

The physician-patient relationship is not a "special relationship" creating a duty to third parties. The relationship is *not* one of control, as a parent would have over her child; it is not one of statutory responsibility, as an officer would have for the safety of the public when encountering a drunk driver. Rather, the physician-patient relationship involves an affirmative duty to care, only for the well-being of the patient in the course of treatment. *St. Germain* v. *Pfeifer*, 418 Mass. 511, 520 (1994). Cf. Restatement (Third) of Torts: Liability for Physical Harm § 41 comment c (Proposed Final Draft No. 1, 2005) ("Unlike most duties, the physician's duty to the patient is explicitly relational: physicians owe a duty of care to *patients*" [emphasis in original]). Premising a physician's duty to third parties on a "special relationship" with his patient would transform the physician's duty of care for his patient into an obligation to control the patient. This is not an accurate characterization of the relationship between physician and patient.

[4]Justice Greaney would go further, positing that the physician has a duty to warn not only of the potential side effects of medications (e.g., drowsiness or dizziness), but also whether the patient should drive at all while taking them. *Ante* at 197-198 (Greaney, J., concurring in part and dissenting in part).

ship, to all those whom the driver encounters is entirely different. Because A has a duty to B, and B has a duty to C, it does not necessarily follow that A has a duty to C. The duty of A to C must be established on its own terms.

That the harm was caused directly by Sacca rather than Dr. Florio is not necessarily fatal to the plaintiff's argument that Dr. Florio owed a duty to the victim of Sacca's negligence. As Justice Ireland states, we have in certain limited circumstances recognized a duty where an "unreasonably dangerous condition [created by a defendant] involves the foreseeable criminal or negligent conduct of an intermediary." *Ante* at 189 (Ireland, J., concurring), citing *Jupin* v. *Kask*, 447 Mass. 141, 147 (2006) (*Jupin*). In *Jupin*, we concluded that a homeowner who allowed the storage of dangerous instrumentalities (firearms) in her home, and permitted a person whom she knew to have had a history of violence and mental instability unfettered access to that home, owed a duty of reasonable care (with respect to the storage of those guns) to a police officer who was subsequently shot by that person with one of the guns stolen from an (allegedly) unsecured cabinet in the home. We imposed this duty after careful consideration of the extremely dangerous nature of the instrumentality, a statutory framework that required gun owners to ensure that their firearms were " 'secured in a locked container' when stored" (G. L. c. 140, § 131L [*a*]), and after concluding that the creation of the duty would not expose homeowners to "endless liability and litigation" over the acts of "innumerable persons." *Id.* at 152-154.

I would not equate the "unreasonably dangerous condition" created by the homeowner in *Jupin* with a doctor's prescription of medication necessary to the treatment of a patient. But that is in essence what Justice Ireland would do. Moreover, he would justify the imposition of this new duty on the supposition that this is but a minimal step. A physician, after all, he reasons, is already obliged to warn his patient of potential side effects of medications. *Cottam, supra* at 321. Given that duty, the argument goes, it is inconsequential to extend the duty to others. "The duty described here," Justice Ireland claims, "requires nothing from a doctor that is not already required by his duty to his patient." *Ante* at 191 (Ireland, J., concurring). To accept this

justification, however, one must presume that the addition of a duty to third parties will have no effect on the nature of the duty of care owed by a doctor to his patient. Such a presumption is not supported by the nature of a physician's duty to warn his patients about the potential side effects of medications and other treatments.

A duty to warn generally arises in cases involving a product with an inherent danger. See, e.g., *Mitchell* v. *Sky Climber, Inc.*, 396 Mass. 629, 631 (1986) (manufacturer of product has duty to warn all foreseeable users of dangers in use of that product of which he knows or should have known). This duty does not arise from of any affirmative relationship between a manufacturer and a user, but from a duty a manufacturer has to act reasonably. In the physician-patient context, however, the duty to warn is part of the duty of care the physician has for the patient. *Cottam*, *supra* at 322. That duty rarely involves warnings akin to information a manufacturer might give to potential users of its products, such as, "do not insert your finger between the rotating blades." Rather, it involves a process of communication and decision-making aimed at the well-being of the patient, and the patient alone, in which the advantages and risks of particular treatments are discussed and weighed. See *St. Germain* v. *Pfeifer*, 418 Mass. 511, 520 (1994); Restatement (Third) of Torts: Liability for Physical Harm § 41 comment *c* (Proposed Final Draft No. 1, 2005) ("Unlike most duties, the physician's duty to the patient is explicitly relational: physicians owe a duty of care to *patients*" [emphasis in original]).

The special nature of the duty to warn in the context of the doctor-patient relationship (as contrasted with the manufacturer-user context) is evident in this court's reasoning in *Cottam*. In that case, we held that the "physician [not the pharmacy] is the appropriate person to perform the duty of warning a patient of the possible side effects of prescription drugs," *Cottam*, *supra* at 322, adopting the rationale that "[p]hysicians, after considering the history and needs of their patients and the qualities of the drug, are required to inform their patients of those side effects they determine are necessary and relevant for patients to know in making an informed decision," *id.* at 321. The court went on to conclude that the physician's duty to inform of poten-

tial side effects of medication he prescribes is so central to the treatment of a patient that involving others in it (such as the pharmacy) would "interfere with the doctor-patient relationship." *Id.* at 321, citing *McKee* v. *American Home Prods. Corp.*, 113 Wash. 2d 701, 711 (1989).

"Interfere" is a strong word. In using it, the court confirmed a strong policy of maintaining that relationship as autonomous, free from the influence of concerns beyond the patient's well-being. This reflects long-held norms about the relationship between doctor and patient and the sound social policy that a doctor's interest be solely in the well-being of his patient. The duty proposed by Justice Ireland today, however, would do exactly what *Cottam* sought to avoid: it would interfere with and distort the doctor-patient relationship. Claiming that the duty he would impose would require nothing more of a doctor than is already required, a simple duty to warn, Justice Ireland misapprehends the nature of the duty to a patient, and fails to consider the distorting effect of insinuating the doctor's concerns about third parties into his decisions about the treatment of a patient. Justice Ireland avoids the problem of this distortion by suggesting that it is no distortion at all.

A nuanced communication between doctor and patient works well (and is presumably highly preferable) where a doctor's concern is focused solely on what, in his or her judgment, the patient's own situation requires. With his or her attention now, necessarily, also directed elsewhere, however, the doctor may, understandably, become less concerned about the particular requirements of any given patient, and more concerned with protecting himself or herself from lawsuits by the potentially vast number of persons who will interact with and may fall victim to that patient's conduct outside of the treatment setting. The substance and extent of the doctor's advice and judgment about "warnings" will necessarily be affected. Is the doctor to tell a patient whenever a medication is prescribed that might in some circumstance cause drowsiness or fainting, "Do not drive. Do not hold your grandchild. Do not carry grocery bags to your car. In fact, do not do anything that involves interacting with another person?" Or will the patient now routinely be handed a printout of all possible side effects of any medication prescribed by

the doctor and be asked to read and sign it in the physician's office, as a substitute for a discussion more tailored to the physician's judgment about what the patient's situation requires and what the patient needs to know in order to make an informed decision? This is not an alarmist reading of Justice Ireland's concurring opinion. The natural extension of its logic protrudes beyond the question whether any "warning" regarding side effects was given into the adequacy and completeness of that warning as concerns all possible side effects.

Even were I to accept Justice Ireland's claim that the duty he would impose would not, in reality, change the treatment decisions and advice of doctors, I would still be concerned by the vast increase in litigation it would invite. Justice Ireland's concurring opinion uses the most restrained language on this point, admitting only that "[a]llowing a larger number of potential plaintiffs may result in some increase in litigation . . . ." *Ante* at 192 (Ireland, J., concurring). This is a significant understatement. Almost everyone is, at some point in their lives, under the care of a doctor. This care often involves medication (or treatment) that might conceivably cause some impairment of the patient's faculties. If there were now a duty owed by doctors to parties injured by their patients, the doctor would be a potential defendant whenever the reaction of the patient to a medication is a possible contributor to an injury. Accordingly, it is hard to imagine a plaintiff's attorney failing in negligence cases to sue not just the negligent party who caused the injury but also his or her doctor. Even if the majority of these claims eventually did not result in verdicts for plaintiffs, the fact that they could be brought would increase costs and (in my view) modify the behavior of doctors in a way not necessarily helpful to patients.[5] Both of these would be undesirable outcomes. They severely undermine the claim that "[s]ound public policy . . .

---

[5]Having expressed little concern that the duty he would impose would spur an increase in litigation, Justice Ireland then "leave[s] to the Legislature the task of determining whether to impose further limits on doctors' liability." *Ante* at 192 (Ireland, J., concurring). This implies that a decision in this area should take little account of the consequences on tort litigation. Yet a decision to impose a duty is at heart a decision about values and social policy, including the value of limiting or expanding the possibility of litigation under given circumstances. See *Cremins* v. *Clancy*, 415 Mass. 289, 292 (1993) (existence

favors a duty in these circumstances." *Ante* at 191 (Ireland, J., concurring).

Allowing such suits against doctors would also threaten the confidentiality inherent in the doctor-patient relationship. Patient privacy is a matter of great public concern. That concern has translated into strong statutory and regulatory protections for the privacy of patient records at both the State and Federal level. See, e.g., Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936, and privacy regulations promulgated pursuant to its Title II at 45 C.F.R. Parts 160 and 164 (2007). See also G. L. c. 111, § 70E (patients' rights). A patient's decision to sue his doctor in malpractice implies a waiver of that confidentiality for purposes of the suit. In contrast, there is no such implied waiver in cases in which the doctor is sued by an injured party who is not the doctor's patient. How are doctors to respond when faced with inquiries from third parties about discussions they have had with patients about their treatments? Statutes as well as professional codes of ethics constrain how a doctor can answer such inquiries. Yet if there is now imposed on the doctor a duty to the party making the inquiry, this places doctors in an untenable situation.

Because the duty Justice Ireland (and the Justices who join him) would recognize might fundamentally alter the relationship between doctor and patient, and increase significantly the costs of health care, contrary to sound policy, and because such a duty is plainly not warranted by any existing precedent, I respectfully dissent.[6]

---

of duty of care decided "by reference to existing social values and customs and appropriate social policy").

[6]We are not the first State to address the question. In circumstances similar to this case, two States have declined to impose on doctors a duty to third parties harmed by a patient. *Kirk* v. *Michael Reese Hosp. & Med. Ctr.*, 117 Ill. 2d 507 (1987); *Calwell* v. *Hassan*, 260 Kan. 769 (1996). The Supreme Court of Hawai'i, in contrast, did recognize such a duty in similar circumstances. *Mc-Kenzie* v. *Hawai'i Permanente Med. Group, Inc.*, 98 Haw. 296, 307-309 (2002). The Hawai'i court emphasized that it meant to impose only a duty to warn the patient not to drive, a duty which the court proclaimed the doctor already had. Two other cases relied on by Justice Ireland are readily distinguishable. See *Hardee* v. *Bio-Medical Applications of S.C., Inc.*, 370 S.C. 511, 516 (2006); *Joy* v. *Eastern Me. Med. Ctr.*, 529 A.2d 1364 (Me. 1987). Both cases involved patients who received treatments and medications administered

by the doctor in his office. Although the treatments caused impairment, the patients were allowed to leave the office before the impairment subsided, resulting in accidents. The duty in those cases rests squarely on the present control the doctors had over their patients. In contrast, this case presents a patient administering prescription medication to himself, at home, over a course of many months. The elements of present control and temporal proximity, so central to the reasoning of the courts in the South Carolina and Maine cases, are lacking here. This distinction was critical to two decisions by the Supreme Court of New Mexico. Compare *Wilschinsky* v. *Medina*, 108 N.M. 511 (1989) (physician owed duty to driving public when administering drugs to patient in office), with *Lester* v. *Hall*, 126 N.M. 404 (1998) (no duty where medication taken away from office, injury caused remote in time).